IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

GITTINS V. WINDSTREAM CORP.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MICHAEL GITTINS, APPELLEE,

V.

WINDSTREAM CORPORATION, APPELLANT.

Filed February 24, 2015.    No. A-14-525.

Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed in part, and in part reversed.

Patrick Mack and Gregory D. Worth, of McAnany, Van Cleave & Phillips, P.A., for appellant.

Roger D. Moore, of Rehm, Bennett & Moore, P.C., L.L.O., for appellee.

IRWIN, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Windstream Corporation appeals from the Workers' Compensation Court's award to Michael Gittins of (1) permanent partial disability benefits based on a 65-percent loss of earning capacity; (2) a waiting time penalty; (3) a $4,000 attorney fee; and (4) future medical care. We affirm the compensation court's award of permanent partial disability benefits based on a 65-percent loss of earning capacity, the waiting time penalty, and the attorney fee. However, we reverse that portion of the court's order awarding future medical care.

FACTUAL BACKGROUND

On August 14, 2011, Gittins was working as a customer service technician for Windstream in Lincoln. On that date, Gittins climbed a pole and was lifting wires to place onto a

bolt on the pole when he felt pain in both shoulders. Gittins continued to work, and reported the injury one week later when the pain continued.

Gittins was examined on August 30, 2011, by Dr. Justin Harris at Nebraska Orthopaedic and Sports Medicine, P.C. Dr. Harris assessed that Gittins had "[b]ilateral subacromial impingement syndrome, right worse than left." Gittins was to be treated nonsurgically. The right shoulder subacromial space was injected, and Gittins was to attend physical therapy and return in 6 weeks.

On October 11, 2011, Gittins returned to Dr. Harris, who ordered an MRI. An MRI of Gittins' right shoulder was done on October 19 and showed:

> (1) Partial tear of the supraspinatus tendon at the footprint. There is no retraction or focal fatty atrophy.

> (2) Tendinopathy within the rotator cuff with strain pattern to the supraspinatus and teres minor muscles.

> (3) Irregularity of the inferior labrum without discrete linear labral tear. The appearance suggests previous labral injury or degeneration. No para labral cyst.

Dr. Harris reviewed the MRI on October 20, and noted that the MRI confirmed impingement syndrome in the right shoulder. He recommended continued observation, anti-inflammatories, and physical therapy.

On October 28, 2011, Gittins returned to Dr. Harris. Gittins was assessed with right shoulder subacromial impingement syndrome and AC joint arthrosis. Dr. Harris recommended a right shoulder "arthroscopy, subacromial decompression, distal clavicle resection, and other work as indicated."

On December 5, 2011, Gittins had a preoperative evaluation at Northrup Internal Medicine by Elaine Christiansen, A.P.R.N. (nurse practitioner), and was cleared for surgery. On December 12, Dr. Harris performed a right shoulder arthroscopic subacromial decompression and right shoulder arthroscopic distal clavicle resection. After surgery, Gittins received physical therapy and worked on a home exercise program.

On January 20, 2012, Dr. Harris noted that Gittins complained of increased pain. Gittins was to continue physical therapy and pain medication. Gittins was to remain off work. On March 2, Gittins returned to Dr. Harris due to a flare-up of right shoulder pain. He was given more medication and his subacromial space was injected. Gittins was to continue physical therapy. On April 13, Gittins was still complaining of AC joint pain and swelling. Dr. Harris noted that Gittins was to be treated nonsurgically and was given another injection in his AC joint. Dr. Harris noted that Gittins could return to work on light duty. However, Windstream had no work for Gittins within his restrictions.

On May 25, 2012, Gittins returned to Dr. Harris still complaining of pain. Dr. Harris ordered a new MRI, which was done on June 11. The MRI showed some fluid in the AC joint consistent with postsurgical changes. Dr. Harris recommended a "revision shoulder arthroscopy with a posterior capsular release" and a "revision distal clavicle resection." Surgery was to be scheduled upon approval by workers' compensation.

Windstream requested that Gittins be examined by Dr. Michael Morrison. On July 30, 2012, Dr. Morrison performed an independent medical exam of Gittins. Dr. Morrison agreed

with Dr. Harris that Gittins would benefit from an "outpatient arthroscopy of his right shoulder again and, specifically, a manipulation of his shoulder to improve his range of motion and diminish the adhesive capsulitis."

On August 23, 2012, Gittins returned to nurse practitioner Christiansen at Northrup Internal Medicine for pain relief medication for his right shoulder. And on October 25, he returned for a preoperative evaluation and was cleared for surgery. On October 31, Dr. Harris performed a right shoulder arthroscopic posterior capsular release and a right shoulder arthroscopic revision distal clavicle resection. After surgery, Gittins participated in physical therapy.

On December 18, 2012, Gittins returned to Dr. Harris and was complaining of constant pain. Dr. Harris ordered continued physical therapy and permitted him to return to light duty work. Gittins returned to work with restrictions on January 14, 2013.

On January 29, 2013, Gittins returned to Dr. Harris complaining of pain at night when laying on his right side. Dr. Harris recommended a work hardening program and "very liberal" work restrictions. Gittins was to return in 6 weeks for a final check, and if he could not get back to full work duty, then a functional capacity evaluation (FCE) would be recommended.

On March 12, 2013, Gittins returned to Dr. Harris complaining of pain and weakness. Dr. Harris found Gittins to be at maximum medical improvement (MMI). He ordered a FCE to determine permanent work restrictions and told Gittins to return as needed.

On March 18, 2013, a FCE was completed by Bruce Bednar at Lincoln Orthopedic Physical Therapy, P.C. Bednar found that Gittins was able to function in the modified medium physical demand category on a full-time basis. Gittins had limitations lifting above shoulder height and he had increased pain when reaching away from his body or holding his arms away from his body for prolonged periods of time. Gittins did well when working at waist level and below shoulder height and avoiding abducted and externally rotated positions. Bednar found Gittins to have a 5-percent permanent impairment of the right upper extremity due to subacromial decompression, and a 10-percent impairment due to distal clavicle resection. Bednar noted that the combined values charts in the "Guides to the of [sic] Evaluation of Permanent Impairment (6th Edition, Revised 2008)," provide that Gittins has an AMA impairment of the right upper extremity of 15-percent.

On April 27, 2013, Dr. Harris noted on a "Workers' Compensation Medical Report" that Gittins had reached MMI on March 12, 2013, and that there was an impairment of 10-percent of the right upper extremity and 1-percent of the left upper extremity. Dr. Harris was asked if it was likely that some form of future medical care would be necessary for Gittins' injury, and Dr. Harris answered "no." Dr. Harris noted that permanent restrictions were to be determined by a FCE, and vocational retraining would be in the best interest of Gittins. On July 12, Dr. Harris wrote that the permanent restrictions in the FCE were necessary to avoid aggravation or exacerbation of the conditions for which he treated Gittins.

On August 2, 2013, Gittins returned to Dr. Harris complaining of right shoulder pain. Gittins was working light duty at the time. Dr. Harris noted that he did not see anything that he could do to make it better and again stated that Gittins was at MMI. Dr. Harris noted that the pain should get better with time and a home rehabilitation program.

On September 19, 2013, Windstream had Gittins examined by Dr. David Diamant. Dr. Diamant's impression of Gittins was:

1. Right shoulder pain status post right shoulder surgery twice.

2. Continued symptoms of right shoulder impingement syndrome with rotator cuff weakness.

3. Intermittent left shoulder impingement syndrome.

Dr. Diamant stated that the right upper limb symptoms seemed to be a result of the 2011 work-related accident, and that the left shoulder symptoms seemed to come on at the date of injury and worsened as a result of over-use of the left upper limb while compensating for the right upper limb pain. In a section titled "answers to questions posed by Council [sic]," Dr. Diamant stated that there was a 4-percent permanent impairment of the left upper extremity. We note that Dr. Diamant did not give an impairment rating for the upper right extremity. With regard to permanent work restrictions, Dr. Diamant recommended that Gittins follow the FCE.

On October 29, 2013, Gittins went to Dr. Patrick Hurlbut on his own accord because he wanted another opinion. Dr. Hurlbut diagnosed Gittins with periscapular weakness in the right shoulder and possible bilateral neuritis/pain syndrome. Dr. Hurlbut recommended specific home exercises and medication.

On December 23, 2013, Gittins returned to Elaine Christensen on his own accord complaining of continued pain. Christensen noted that Drs. Harris and Diamant thought that Gittins was at MMI. Christensen referred Gittins to the Nebraska Pain Clinic and prescribed him Voltaren gel for his shoulder. At trial, Gittins testified that he never went to the Nebraska Pain Clinic because he was too busy. He also testified that he was using the Voltaren gel, but that it did not provide much relief.

Upon agreement by counsel for Gittins and Windstream, Michael McKeeman was designated the vocational rehabilitation counselor regarding the Loss of Earning Power Statement for Gittins. McKeeman met with Gittins on December 17, 2013. McKeeman noted that Gittins was 59 years old, had a high school diploma, and had worked for Windstream or its predecessors for over 40 years. Although a detailed report appears in our record, McKeeman surmised that if Gittins were able to keep his job at Windstream, his total loss of earning power would be 11- to 13-percent; but if he were to lose his job as a result of his injury, he would have a total loss of earning power of 63- to 69-percent.

Gittins testified that since returning to work at Windstream in January 2013, he can no longer climb poles which is a large part of his job. If he has a job that requires pole climbing, Gittins has to call his boss, who then has to get someone to go out to do that part of Gittins' job for him; the same process is required if a ladder is needed, because Gittins can no longer carry a ladder. Gittins testified that he also has trouble doing "knits," which he described as making a connection from Windstream's equipment to the customer's equipment, because in older homes the connection needs to be made in the basement ceiling and Gittins' has trouble reaching above his head. Gittins stated that Windstream will no longer allow him to be on call because there is a chance that he would have to climb a pole and the company is not willing to call somebody else out to help him; as a result, he no longer earns overtime because he used to sign up for "on call" status whenever it was available. Gittins also testified that a human resources employee told him

that Windstream generally does not like to make accommodations for more than 3 months, and that if the company does not accommodate, then the employee is let go. Gittins also testified that the company wanted to reduce its workforce and was offering buyouts. However, the buyouts were occurring in a different department than the one in which Gittins works because the buyouts in Gittins' area were subject to a union contract and would require more money.

PROCEDURAL BACKGROUND

Gittins filed his petition on June 26, 2012, alleging that on August 14, 2011, he sustained an accident and injury arising out of and in the course of his employment with Windstream. Gittins alleged that the bilateral shoulder injuries occurred while he was lifting cable off of his belt and onto a bolt on a pole. Gittins alleged that the matters in dispute were: temporary disability benefits, permanent disability benefits, payment of medical expenses, vocational rehabilitation benefits, waiting time penalties, attorney fees, and interest.

Windstream filed its answer on July 17, 2012, admitting that Gittins sustained a work injury on August 14, 2011, but denied the nature and extent of the injury. Windstream admitted that Gittins was entitled to workers' compensation benefits, but alleged that it was providing Gittins with all appropriate benefits. Windstream therefore generally denied that Gittins was entitled to the benefits set forth in his petition, and alleged that a reasonable controversy existed between the parties.

The Workers' Compensation Court's award was filed on May 6, 2014. The court found that on August 14, 2011, Gittins injured both shoulders in an accident arising out of and in the course of his employment with Windstream, but the date of the accident was not the date of the injury; the date of the accident was August 30, the date Gittins stopped work and sought medical care, and that was the date from which compensation begins to be paid. Gittins worked through December 11, at which time he had to stop work because of the surgery on December 12. Gittins did not return to work until January 14, 2013. During that period of time, Gittins was under the care of Dr. Harris convalescing from his injuries. The court ordered Windstream to pay temporary total benefits from December 12, 2011, through January 13, 2013, the day before Gittins returned to work.

The court found that it is speculation as to whether Gittins will retain his job at Windstream. The court noted that Windstream has accommodated Gittins' restrictions in the past, but there is no guarantee that it will continue to do so. The court also noted that Gittins' occupation (installing telephones) is dying, because more and more people are abandoning land lines in favor of cell phones. Accordingly, the court awarded Gittins a 65-percent loss of earning capacity from August 30 to December 11, 2011, and from January 14, 2013, and continuing forward.

The court ordered Windstream to pay certain medical bills. And the court ordered Windstream to pay future medical care, noting that Gittins was referred to the Nebraska Pain Clinic and prescribed Voltaren gel.

Windstream was ordered to pay a penalty of $349 for its failure to pay benefits for a one-week period in June 2012. Windstream was also ordered to pay a penalty of $8,637.75 for late payment of permanent benefits. Finally, Windstream was ordered to pay attorney fees in the amount of $4,000 because of the late payments it made. Windstream appeals.

## ASSIGNMENTS OF ERROR

Windstream assigns that the compensation court erred in awarding Gittins (1) permanent partial disability compensation for a 65-percent loss of earning capacity because the record lacks sufficient competent evidence that he sustained a 65-percent loss of earning capacity, (2) a waiting time penalty pursuant to Neb. Rev. Stat. § 48-125 (Cum. Supp. 2012) because a reasonable controversy existed at all times throughout litigation in regards to his entitlement to benefits, (3) an attorney fee because the record lacks sufficient competent evidence that an attorney fee should be awarded, and (4) future medical benefits because the record lacks sufficient competent evidence that he is in need of future medical care.

## STANDARD OF REVIEW

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Simmons v. Precast Haulers*, 288 Neb. 480, 849 N.W.2d 117 (2014). In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court, the findings of fact of the trial judge will not be disturbed on appeal unless clearly wrong. *Id*.

In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, every controverted fact must be resolved in favor of the successful party and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Id*.

## ANALYSIS

*Permanent Partial Disability.*

Windstream argues that the compensation court erred in awarding Gittins permanent partial disability compensation for a 65-percent loss of earning capacity because the evidence at trial showed Gittins' loss of earning capacity was only 11- to 13-percent based upon him still being employed by Windstream. Gittins was assigned permanent impairment ratings to both his right and left shoulders, and he therefore invoked consideration of his loss of earning capacity as allowed under the third paragraph contained in Neb. Rev. Stat. § 48-121(3) (Reissue 2010), which was added to the statute by 2007 Neb. Laws, L.B. 588. See *Rodgers v. Nebraska State Fair*, 288 Neb. 92, 846 N.W.2d 195 (2014). This third paragraph of § 48-121(3) provides a discretionary remedy consisting of a loss of earning capacity award in lieu of scheduled member compensation where two or more members are involved and there is at least a 30-percent loss of earning capacity. *Id*. The third paragraph of § 48-121(3) states:

> . . .
>
> If, in the compensation court's discretion, compensation benefits payable for a loss or loss of use of more than one member or parts of more than one member set forth in this subdivision, resulting from the same accident or illness, do not adequately compensate the employee for such loss or loss of use *and such loss or loss of use results*

- 6 -

*in at least a thirty percent loss of earning capacity*, the compensation court shall, upon request of the employee, determine the employee's loss of earning capacity consistent with the process for such determination under subdivision (1) or (2) of this section, and in such a case the employee shall not be entitled to compensation under this subdivision.

> . . .

(Emphasis added.)

In the present case, Michael McKeeman was the vocational rehabilitation counselor agreed upon by the parties to prepare the Loss of Earning Power Statement for Gittins. McKeeman surmised that if Gittins were able to keep his job at Windstream, his total loss of earning power would be 11- to 13-percent; but if he were to lose his job as a result of his injury, he would have a total loss of earning power of 63- to 69-percent. A loss of earning power evaluation performed by a vocational rehabilitation counselor selected by the parties is entitled to a rebuttable presumption of correctness. *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002). See, also, Neb. Rev. Stat. § 48-162.01(3) (Reissue 2010).

Gittins testified that he was still employed by Windstream, although he can no longer climb poles or carry ladders. He also testified that Windstream does not like to make accommodations for more than 3 months, and if they do not make accommodations, the employee is let go.

In awarding Gittins permanent partial disability compensation for a 65-percent loss of earning capacity, the compensation court stated:

> It is obvious that if plaintiff is no longer employed by defendant, he suffers at least a 65-percent loss of earning capacity, a major portion of which will be loss of wages. It is speculation to believe that plaintiff will continue to remain employed until the normal retirement age of 66, the age at which one can receive full social security benefits. Furthermore, the defendant has to accommodate plaintiff's restrictions, and while it has done so in the past, there is no guarantee that it will do so in the future. Another issue is plaintiff's employment is installing telephones in residences. A phone in a residence is known as a landline and is hardwired in the house, and from the house to a pole, to a telephone distribution center. Technology is changing the world and is doing so at a rapid pace. More and more people are abandoning landline telephones in their homes and switching to mobile telephones which not only one can use to call practically anybody in the world but also connect to the internet. Mobile phones require no landline. More and more people have come to the conclusion that the landline is not necessary when you have a mobile phone that performs the same service. Plaintiff testified that defendant is laying off workers, and, due to changes in technology, layoffs will continue. Fewer and fewer people will have landline phones in their homes which will decrease the need for workers who install and/or replace and/or repair those phones. Plaintiff's occupation is dying. Because it is speculation on whether or not the plaintiff will retain his job, a loss of earning capacity will be awarded. His loss of earning capacity is found to be 65 percent.

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Straub v. City of Scottsbluff*, 280 Neb. 163, 784 N.W.2d 886 (2010). In testing the sufficiency of the evidence to support the findings of fact by the Workers' Compensation Court, the evidence must be considered in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Id.* A workers' compensation award cannot be based on possibility or speculation; if an inference favorable to the claimant can only be reached on the basis thereof, then the claimant cannot recover. *Berggren v. Grand Island Accessories, Inc.*, 249 Neb. 789, 545 N.W.2d 727 (1996).

The question in this case is whether the compensation court engaged in possibility or speculation when it based the loss of earning capacity on Gittins not being employed by Windstream when he still was so employed, or whether there were sufficient facts to support the court's conclusion that his ability to stay employed was not likely.

While it may appear speculative, there was evidence in the present case upon which the compensation court could contemplate the unlikelihood of Gittins' sustained employment given his uncontested physical restrictions and stated concerns about ongoing employment. We note that in *Davis v. Goodyear Tire & Rubber Co.*, 269 Neb. 683, 696 N.W.2d 142 (2005), the employee, Davis, was able to continue working at Goodyear, but with physical restrictions. The vocational rehabilitation counselor opined that Davis had suffered a 25- to 30-percent loss of earning power if he was able to continue working at Goodyear, but a 60- to 70-percent loss of earning power if Davis lost his job. The trial judge noted the engineering manager for the plant where Davis was employed testified that Davis' performance had been effective and that there was no reason to believe Davis would be laid off. The trial judge concluded that Davis suffered a 27.5 percent loss of earning power and awarded benefits accordingly. In affirming the trial court, the Nebraska Supreme court found that the trial court's finding was supported by sufficient evidence and was not clearly wrong. The Supreme Court noted that

> under the circumstances, any opinion regarding Davis' loss of earning power would be contingent upon Davis either retaining or losing his employment with Goodyear. A certain degree of contemplation regarding future events is inherent in any determination of an employee's employability; it is the province of the trier of fact to evaluate the evidence and make a reasonably certain finding of the employee's loss of earning power.

The Supreme Court also noted that the trial court relied upon competent evidence supporting its conclusions that Davis was unlikely to lose his job at Goodyear and that when that job was considered as part of the overall labor market, Davis had suffered a 27.5-percent loss of earning power.

In the present case, we are guided by the *Davis* court, specifically, that when considering a loss of earning power contingent upon an employee retaining or losing his job, a certain degree of contemplation regarding future events is necessary to determine employability. And since it is the province of the trier of fact to evaluate the evidence and make a reasonably certain finding of the employee's loss of earning power, we consider the evidence upon which the compensation court relied in making its decision. As stated previously, Gittins testified that he was still

employed by Windstream, although he can no longer climb poles or carry ladders. He also testified that Windstream does not like to make accommodations for more than 3 months, and if they do not make accommodations, the employee is let go. There was no testimony to the contrary from Windstream. In awarding a 65-percent loss of earning capacity to Gittins, the compensation court apparently gave weight to Gittins' testimony when it determined that he would not likely remain employed by Windstream. Additionally, Gittins testified to no longer being able to be "on call" to earn overtime and that Windstream was reducing its workforce. Every controverted fact must be resolved in favor of the successful party and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. Gittins' testimony about these matters was not challenged by Windstream; accordingly, there was evidence upon which the compensation court could conclude that Gittins was not likely to retain employment and we cannot say the court erred in this regard. We therefore affirm the compensation court's award of permanent partial disability benefits based on a 65-percent loss of earning capacity.

*Waiting Time Penalty.*

Windstream argues that the compensation court erred in awarding Gittins a waiting time penalty for the alleged late payment of permanent partial disability compensation because a reasonable controversy existed at all times throughout litigation in regards to his entitlement to benefits.

Neb. Rev. Stat. § 48-125 (Cum. Supp. 2012) provides:

(1)(a) Except as hereinafter provided, all amounts of compensation payable under the Nebraska Workers' Compensation Act shall be payable periodically in accordance with the methods of payment of wages of the employee at the time of the injury or death. Such payments shall be sent directly to the person entitled to compensation or his or her designated representative except as otherwise provided in section 48-149.

(b) Fifty percent shall be added for waiting time for all delinquent payments after thirty days' notice has been given of disability or after thirty days from the entry of a final order, award, or judgment of the Nebraska Workers' Compensation Court, except that for any award or judgment against the state in excess of one hundred thousand dollars which must be reviewed by the Legislature as provided in section 48-1,102, fifty percent shall be added for waiting time for delinquent payments thirty days after the effective date of the legislative bill appropriating any funds necessary to pay the portion of the award or judgment in excess of one hundred thousand dollars.

Dr. Harris stated in an April 27, 2013, "Workers' Compensation Medical Report" that Gittins had a permanent impairment of 10-percent of the right upper extremity and 1-percent of the left upper extremity. The compensation court noted that on August 8, 2013, Gittins filed an application for the appointment of a vocational rehabilitation counselor, and attached to that application was the report of Dr. Harris setting forth the impairments to both upper extremities. The compensation court stated that "[a]s a result, [Windstream] knew on or before August 8, 2013, of the ratings from Dr. Harris, the treating physician." We note that the August 8 application for the appointment of a vocational rehabilitation counselor does not appear in our

record, but neither party argues that such did not exist. We also note in our record there is an October 29 "motion to compel, 2nd request," wherein Gittins moved the court to "enter an Order compelling the appointment of a Vocational Rehabilitation counselor to prepare a Loss of Earning Power Evaluation"; given that this is a "2nd request," there would have been an original request prior to October 29, and we accept the compensation court's statement that such request was filed on August 8. Furthermore, on September 19, 2013, Dr. Diamant conducted an independent medical exam of Gittins at the request of Windstream and found that Gittins had a 4-percent impairment of the left upper extremity; as noted previously, Dr. Diamant did not give an impairment rating for the upper right extremity.

We find that Windstream had notice of Gittins' disability on April 27, 2013, the date Dr. Harris stated that Gittins had a permanent impairment of 10-percent of the right upper extremity and 1-percent of the left upper extremity. Even if there was a reasonable controversy as to whether Gittins was entitled to a loss of earning capacity in lieu of impairment to scheduled members, there was no question that Gittins was entitled to some amount of permanent partial disability as of the date of Dr. Harris' report on April 27. Even if we agree with the compensation court's more lenient notice date of August 8, Windstream still failed to make any permanent partial disability payment until January 29, 2014, more than 30 days after receiving that later notice. Accordingly, there is sufficient evidence in the record to support the compensation court's award of a waiting time penalty based on a permanent impairment rating of 10-percent of the right upper extremity and 1-percent of the left upper extremity. See *Musil v. J.A. Baldwin Manuf. Co.*, 233 Neb. 901, 448 N.W.2d 591 (1989) (though there was controversy as to nature and extent of claimant's permanent disability, there was no basis to dispute that claimant was permanently disabled, and therefore claimant was entitled to award of attorney fees, interest, and 50-percent penalty for waiting time for delinquent payments; instead of at least paying compensation for some amount of permanent partial disability, employer paid no compensation at all). We therefore affirm the compensation court's award of a waiting time penalty as set forth above.

*Attorney Fees.*

Windstream argues that the compensation court erred in awarding an attorney fee because the record lacks sufficient competent evidence that an attorney fee should be awarded.

Neb. Rev. Stat. § 48-125(2)(a) states:

Whenever the employer refuses payment of compensation or medical payments subject to section 48-120, or when the employer neglects to pay compensation for thirty days after injury or neglects to pay medical payments subject to such section after thirty days' notice has been given of the obligation for medical payments, and proceedings are held before the compensation court, a reasonable attorney's fee shall be allowed the employee by the compensation court in all cases when the employee receives an award. . . .

As previously discussed, Windstream was late in making payments for permanent partial disability. Furthermore, Windstream concedes in its brief that it was late in paying temporary total disability compensation. Brief for appellant at 13. Therefore, Gittins is entitled to a reasonable attorney fee pursuant to § 48-125(2)(a). The determination of an award of attorney

fees pursuant to § 48-125 must be calculated on a case-by-case basis. *Simmons v. Precast Haulers*, 288 Neb. 480, 849 N.W.2d 117 (2014). In making that calculation, the trial court should consider, as in other attorney fee contexts, the value of legal services rendered by an attorney by considering the amount involved, the nature of the litigation, the time and labor required, the novelty and difficulty of the questions raised, the skill required to properly conduct the case, the responsibility assumed, the care and diligence exhibited, the result of the suit, the character and standing of the attorney, and the customary charges of the bar for similar services. *Id*.

Gittins did not file an affidavit nor set forth any other evidence regarding his attorney fees. Nevertheless, the compensation court awarded an attorney fee of $4,000, stating:

> The attorney had to prepare the case, try the case, and while some payments were made to the plaintiff, some of those payments were made late and there was no response by the defendant for payment of penalties even though there is no question that the payment made for permanent benefits under § 48-121 was late.

In arguing that there was insufficient evidence to justify the compensation court's award of a $4,000 attorney fee, Windstream directs us to *Kraft v. Paul Reed Constr. & Supply*, 239 Neb. 257, 263, 475 N.W.2d 513, 517-18 (1991), wherein the Nebraska Supreme Court stated:

> We also hereby establish a rule of practice and direct that in an appeal of any type of case filed after December 31, 1991, in this court or the Court of Appeals, any party who claims entitlement under the law or a uniform course of practice to an attorney fee shall, at the time of filing his, her, or its brief, also file a separate claim for such fees supported by an affidavit which justifies the amount sought.

However, the plain language of the Supreme Court's statement in *Kraft* makes it clear that it is discussing the rule of practice that applies in appellate matters. In addressing attorney fees awarded in an underlying matter, the Nebraska Supreme Court has stated that while the best practice is always to provide an affidavit or other evidence such as testimony or exhibits regarding attorney fees, it is not absolutely required that an affidavit be filed. See *Garza v. Garza*, 288 Neb. 218, 846 N.W.2d 636 (2014). However, before an award of attorney fees will be affirmed upon appeal, the record must contain information that shows that the award is reasonable. See *Boamah-Wiafe v. Rashleigh*, 9 Neb. App. 503, 614 N.W.2d 778 (2000). Given that the trial judge presided over the trial itself, and would certainly be knowledgeable regarding reasonable attorney fees incurred in such matters, and in our review of the record before us, we cannot say that the court's factual determination of the attorney fee in this case is clearly wrong. Therefore, we affirm the award of a $4,000 attorney fee.

*Future Medical Benefits.*

Windstream argues that the compensation court erred in awarding future medical benefits because the record lacks sufficient competent evidence that Gittins is in need of future medical care. We agree.

Before an order for future medical benefits may be entered, there should be a stipulation of the parties or evidence in the record to support a determination that future medical treatment will be reasonably necessary to relieve the injured worker from the effects of the work-related

injury or occupational disease. *Sellers v. Reefer Systems*, 283 Neb. 760, 811 N.W.2d 293 (2012). There was no stipulation between Gittins and Windstream that Gittins was entitled to future medical care. The compensation court based its award of future medical care on the December 23, 2013, examination by nurse practitioner Christensen, who referred Gittins to the Nebraska Pain Clinic for his chronic right shoulder pain. The court also noted that Christensen prescribed Voltaren gel for Gittins. However, as noted previously, Gittins testified that he never went to the Nebraska Pain Clinic because he was too busy. He also testified that he was using the Voltaren gel, but that it did not provide much relief. The compensation court stated: "There is an order for future medical care at the Nebraska Pain Clinic. Defendant is ordered to pay for plaintiff's future medical care all as required by § 48-120." Windstream argues that the treatment recommended by Christensen was not authorized since Gittins unilaterally sought treatment with her without a referral from Gittins' treating physician, Dr. Harris.

Pursuant to Neb. Rev. Stat § 48-120(2) (Cum. Supp. 2012),

(a) The employee has the right to select a physician who has maintained the employee's medical records prior to an injury and has a documented history of treatment with the employee prior to an injury or a physician who has maintained the medical records of an immediate family member of the employee prior to an injury and has a documented history of treatment with an immediate family member of the employee prior to an injury. For purposes of this subsection, immediate family member means the employee's spouse, children, parents, stepchildren, and stepparents. The employer shall notify the employee following an injury of such right of selection in a form and manner and within a timeframe established by the compensation court. If the employer fails to notify the employee of such right of selection or fails to notify the employee of such right of selection in a form and manner and within a timeframe established by the compensation court, then the employee has the right to select a physician. If the employee fails to exercise such right of selection in a form and manner and within a timeframe established by the compensation court following notice by the employer pursuant to this subsection, then the employer has the right to select the physician. If selection of the initial physician is made by the employee or employer pursuant to this subsection following notice by the employer pursuant to this subsection, the employee or employer shall not change the initial selection of physician made pursuant to this subsection unless such change is agreed to by the employee and employer or is ordered by the compensation court pursuant to subsection (6) of this section. . . .

. . .

(e) The physician selected may arrange for any consultation, referral, or extraordinary or other specialized medical services as the nature of the injury requires.

(f) The employer is not responsible for medical services furnished or ordered by any physician or other person selected by the employee in disregard of this section. . . .

The parties stipulated at trial that Gittins elected Dr. Harris as his authorized physician by completion of "Form 50," which is an "Employee's Choice or Change of Doctor Form." Gittins underwent a course of treatment with Dr. Harris, who ultimately determined him to be at MMI on March 12, 2013. On April 27, Dr. Harris noted on a "Workers' Compensation Medical

Report" that Gittins had reached MMI on March 12. Dr. Harris was asked if it was likely that some form of future medical care would be necessary for Gittins' injury, and Dr. Harris answered "no." On August 2, Gittins returned to Dr. Harris complaining of right shoulder pain. Dr. Harris noted that he did not see anything that he could do to make it better and again stated that Gittins was at MMI. Dr. Harris noted that the pain should get better with time and a home rehabilitation program.

Gittins unilaterally sought treatment from Christensen after Dr. Harris stated nothing more could be done and that no future medical care was necessary. Dr. Harris did not refer Gittins to Christensen after he declared Gittins to be at MMI. Because Gittins chose Dr. Harris as his treating physician, and Dr. Harris did not refer Gittins to Christensen or the Nebraska Pain Clinic, Windstream is not responsible for any future medical care in that regard. See § 48-120(2)(f). We therefore reverse that portion of the compensation court's order awarding future medical care.

## CONCLUSION

For the reasons stated above, we affirm the compensation court's award of (1) permanent partial disability benefits based on a 65-percent loss of earning capacity,(2) a waiting time penalty based on a permanent impairment rating of 10-percent of the right upper extremity and 1-percent of the left upper extremity, and (3) a $4,000 attorney fee. However, we reverse that portion of the compensation court's order awarding future medical care.

AFFIRMED IN PART, AND IN PART REVERSED.